Our next case this morning, Your Honor, is 24-1007 and 24-1045 Alaniz v. Bay Promo, LLC Mr. Thomas, will you check your microphone for us, please? Test, test. Thank you. Good morning, Your Honors. Do you mind if I remain seated? Not at all. Thank you. My name is George Thomas. I represent Bay Promo, LLC. It's a Florida limited liability corporation. In the case of Arlie Nicole Moncada Alaniz v. Bay Promo, apologies if I've mispronounced any names. Bay Promo raises three issues on appeal, as this Court is aware, the first being that the District Court entered an order detailing how the parties were to make objections during deposition testimony. The position is that Bay Promo followed those directions, but then those objections were never ultimately ruled on. Why weren't those objections made at the time of the admission of the evidence, though? Our position is that when the District Court gave a direction on how to make objections through that highlighter, the pink highlighting or the yellow highlighting, and then in the margins you were to explain the basis and the grounds for those objections. Our position is that once the Court issued that order, any requirement to do something extra would render that order meaningless or moot. But making an objection doesn't mean that the Court is ruling on the objection at the time of trial. I guess you're basically saying you thought you had done enough, whether we agree with you or not. Essentially, I think that's the basis of it, and we believe we did enough. The District Court disagrees, and we're respectfully asking the Court to evaluate. Just with respect to this particular point, since the District Court also asked for motions in a separate order, what's your account of that, that that just wasn't meant to apply to the types of objections that were set forth in the pink highlighting? Well, our position is that once the… I understand that once the pink highlighting was done, but since there was this separate order saying, please make motions, why did you think that order didn't require you? Because then ultimately it would render everything I calculated before moot. But eliminate orders are quite common. Eliminate orders are quite common. You ask for rulings on objections made prior to trial. Or at least when you get to trial, you object if there has been no ruling. I mean, that's the common way trials proceed. Yes, Your Honor. I have no… I'm candid. I'm not going to make something up. In terms of the… I think the primary issue for this Court to delve into is… It's twofold. One is the suit regarding the New York order, and then the other is the counterclaims regarding the other orders. Counsel, before you move to that, I'm just trying to understand, was the testimony that you've objected to that you said the district court never ruled on, was it considered by the district court in its findings of fact and conclusions of lie? I just wasn't sure how the objected to testimony even ended up impacting the decision in the end, or if it did. Can you speak to that? Well, I don't know if I can necessarily make a claim on whether the judge… What role that played in the calculus of the decision. I do know that it came up during cross-examination and during examinations. The objections to certain testimony and information during the depositions started to come out during trial. At that point, again, candidly, trial counsel probably could have objected once more and drawn the Court back towards the pink highlighter sheet. I think what I'm asking, though, is just a little bit different, which is if we look at what the district court actually considered in terms of the evidence of trial in its decision, can you point me to any part of the district court's decision that relies on evidence that you think should have been excluded based on the objections to the deposition testimony with the pink highlighter? Is there anything in particular? I have a quick note. I think where on page 16, I think paragraph 3, the judge states that everyone that's familiar with the New York Order agreed that they promote and the labs and masks were manufactured by people other than those. That statement there tends to lead us to believe that the district court judge gave full credence to everything Jeffrey Craven said, Lee Parrish said, and particularly to that quote, we would argue that every witness familiar with the New York Order is biased in some way. I mean, you have our client, they promote. Then you have Jeffrey Craven, who was not party to the New York Order, and then you have Lee Parrish, who's being sued by they promote, and then the opposing side, which is obviously a contention. I hope I answered those questions as best as I can, Your Honor. In terms of the New York Order, our position through the briefing is that Denham & Moore was not a ready, willing, and able buyer. The contract was between they promote and Denham & Moore for the delivery of masks weeks apart. The contract called for 50% of the price to be paid up front, and then 50% before delivery. Interestingly, in the district court's analysis, it seems that they jump back and forth between the, oh, they promoted it before because it wasn't timely delivered. Well, that's not why New York rejected the order. They rejected the orders, or they rejected the masks because of the FDA certifications. Our position is that the contract was between they promote and Denham & Moore, and Denham & Moore, that contract did not call for a particular manufacturer. Can I ask? This is a point of confusion, I think, about what your argument is and my understanding of Florida law and what the district court did. So I'll just lay out my understanding, and you tell me where you're intervening in this. As I understand it, the district court here identified two different theories of Florida law by which you could recover the commission. One is there's a contract in which the broker delivers a ready and willing and able party, and the agreement is that's almost enough in and of itself. The contract doesn't have to be consummated. The second is you deliver them and it has to be consummated. That was actually the agreement in order to get the commission. But if the reason it's not consummated is a failure of the seller, not the party that the broker brought to the table, broker still gets paid. My understanding is the district court says, I don't have to decide what type of contract this was because either way there was an entitlement to the brokerage fee. Correct? Yes.  So then as I read it, that must mean the district court's willing to assume that there was a contract in which it had to be consummated, and then it's finding that it wasn't the seller's fault that it didn't go through. Correct? The seller meaning they promised? I mean, I'm sorry, that it wasn't the purchaser's fault that it didn't go through. That is the district court's fault. Are you challenging that finding? Are you saying it was the purchaser's fault? Or are you saying the purchaser wasn't ready, willing, and able? Because those seem to me different types of arguments. It's possible you could have provided a ready and willing purchaser, and yet the reason it didn't go through in the end was the purchaser's fault. Isn't that possible? Yes. So which of the arguments are you making? Are you making both arguments? Are you making only an argument that she never brought a ready and willing purchaser to begin with? I just was having trouble. I understand. It's difficult because the district court also kind of didn't go too deep into the analysis of each one. Our position is that Miscellanies brought a, at one point brought a ready, willing, and able buyer, and that was evidenced by the fact that there was a 50% deposit up front. However, the argument is that the Devin Moore, the person that Miscellanies brought to the table, ultimately retracted that readiness, that willingness, that ableness when they decided not to pay. Okay, and what I'm saying is I'm not sure under Florida law that if the purchaser that she brought, that the broker brings to the table, doesn't follow through ultimately. That shows anything about whether a ready and willing, able purchaser was brought to the table. But it may show something about whether the purchaser rather than the seller is responsible for the deal not going through, which could be relevant if the brokerage contract was one in which the deal had to be consummated, but under Florida law it's not the broker's fault if the purchaser doesn't go through. Since the district court didn't say which kind of brokerage agreement it was, I take it the district court had to be saying, even if it was the type of agreement in which you had to consummate it, broker still wins because it was bay promo, the seller's fault it didn't go through, not the purchaser's. So I couldn't quite tell from your brief, are you arguing, because it sounds like you're arguing, no, it was the purchaser's fault that it didn't go through. That is correct, because there's this breakdown in this chain of communication. There's a contract between bay promo and Denman Moore. If Denman Moore has a contract with the New York hospital system, or New York state, I don't recall the exact entity. If Denman Moore knows the New York requirements, Denman Moore should have contracted with bay promo for those exact requirements. And by not doing so, bay promo fulfilled their end of the bargain. Okay, so now on that score, the district court, and this is something I'm a little bit puzzled, the district court, as I read it, found that bay promo did not do what it was supposed to do. Correct? That is what the district court found. The district court also found that there's ongoing litigation about who was at fault between bay promo and Parrish for the failure of the deal. And the district court says I express no view about that. So I'm just a little puzzled. How can it be that the district court's not taking a position on who is at fault for the deal not going through, and at the same time saying it's bay promo's fault? Well, that is my position. And respectfully, you can't have that both ways. But in your brief, I guess there's just no real developed explanation of why you can't have it both ways. And we have a finding that it was your company's fault. Well, I don't think you can have it both ways because you can't say I make no opinion on the underlying contract dispute between bay promo and Dun & Moore all while saying Dun & Moore was at fault, or bay promo was at fault for the failure of the deal. Why is that inconsistent, though? Because the district court is obviously making a ruling based on the specific evidence that has been presented in this particular case and the witnesses that testified. And I don't think the briefs tell us exactly what's happening in the other litigation, but there may be different evidence in that case. So it seems that the district court is saying, based on what was presented to me, it was bay promo's fault that the New York deal didn't happen. And I don't say anything about this other litigation that may involve other evidence. Why are those two things inconsistent? Your Honor, just from our perspective, from just a very practical point of view, we just don't see, even if there is different evidence in the other case, there was still some sort of opinion made. I don't know how else to say it other than our position is that the court did come to an ultimate conclusion, at least in some regard. But you could have brought, like if you wanted to show that it was Parrish's fault in this litigation, you could have brought them in to the litigation. In other words, you just tried to prove your case with this evidence. You lost in the eyes of the district court on that evidence. So as Judge Rookman asked, so what then that in some other case you might win on the same issue? All the judge is doing is saying, this was your case to me as to whose fault it was. I looked at the evidence. I concluded it was your fault. I understand the line of questioning. And again, beyond what I've explained, I think that's kind of the point that needs to be adjudicated. Our position is, our main position, aside from that kind of tangential contributor, is that it was not Bayfront's fault. I mean, just as a general point of contention. And I have just a few moments left, and I would just like to add, in terms of the other orders, there has to be something more than being copied on an email, or the floor law says that you have to have a procuring effect, and you have to be engaged in continued negotiations. And I was preparing, and I found it interesting, the New York order has someone who is a friend of Senator Schumer, who introduces them to Jeffrey Kavins, who introduces them to Ms. Delaney's. It seems that the appellees would ask this court to find that. In the case of the conjugal orders and the other orders, well, of course, may I please finish? Of course, Ms. Delaney's is entitled to those commissions because she introduced one person who introduced another person and their business partners. Well, how that chain can't go on forever. And beyond that, our position is that Ms. Delaney's did not provide any sort of continued negotiation. She wasn't entitled to enter into contracts without express approval. And so the district court is right in their determination that Ms. Delaney's is not entitled to the commissions based on those other orders. I just want you to, before you complete, have a chance to answer, I think it's called the Delta order? Yes. Okay. That's the one where there's a WhatsApp message?  And then the response is yes? So, yes, Your Honor. If I recall, I can pull the exact quote, but basically there was, the comment was a price called $1.50. And so Ms. Delaney's said, a $1.50 includes the 6%, period. I'm going to send the invoice, or I'm going to send the quote, or something. And then their promo responds with, yes, send the quote. The district court was right. What is, there's no, it's ambiguous on what yes is. I mean, yes could be yes, send the quote. It's just too, there's no way to know without any further details on whether or not that was an affirmative agreement to the commissions. And if there is no, and since it is ambiguous, and there is no written contract on this, it seems that it falls on its face. Thank you. Mr. Twain, could you silence your microphone, please? Thank you. Mr. Devine. Good morning, members of the panel. My name is Charles Devine, and I represent the plaintiff who, for the purpose of my argument today, I will refer to as Ms. Moncada, which is the name she goes by. First, I'd like to apologize to the court for my attire. I left the house and forgot my suit coat, so I'm wearing my overcoat today. You look fine. Can you just move your mic a little higher? Thank you. Thank you. So I'd first like to address a few of the issues that were raised in Bay Promo's appeal. The first batching together being the failing to rule on the objection for the depositions, and the second would be the Spanish language exhibits. In both cases, it's the plaintiff's contention that the defendant never asserted an objection, a timely objection at trial on either of those issues. In fact, on the Spanish exhibits, counsel acknowledged that they were being admitted by agreement. The quote that's contained in the record is, I'm fine with it, Your Honor, just so long as I understand that you speak a little Spanish. I'm fine with putting in the exhibits without a Spanish translation. So your position is that there's actually a waiver, not just a forfeiture, on the Spanish translations? I believe that there's a waiver here, and I believe that really I even think calling it a waiver is stating too much because I don't believe that there's a requirement that certified translations accompany Spanish documents in the U.S. District Court. Now, there's certain exceptions in certain courts. So in Puerto Rico, for instance, there is a rule, a local rule that says that requires translations. In this court, there is a rule that requires translations of Spanish documents. But in the Massachusetts District Court, there is not. And I cited cases in my brief that talk about Spanish language and foreign language documents being submitted into evidence a variety of different ways, including one situation. The court reporter herself just read who was able to speak that language, just translated it for the court, and that was deemed acceptable. There seems to be a lot of discretion with the trial court judge on that issue, and I think that the judge exercised that discretion in this case. So moving beyond that and getting into the substance of the Bay Promo's appeal, especially with regard to the misconstruction of evidence and the applicability of the Knowles decision, I think that my brother, Tousell, distilled his point that, he said his position is that Mercado brought or did not bring, or actually he acknowledged bringing a ready, willing, and able buyer, but he said that the purchaser breached, not the seller. Well, on this record, there is no evidence that the purchaser breached. In fact, the evidence brought in by Bay Promo, by Mr. Umberto Aguelo himself, was that he provided the FDA certifications to Bay Promo, to Denim and Moore through Ms. Mercado. A week or two later, he provided a guarantee that the manufacturer, a written guarantee, that the manufacturer of the mask going to New York would be an entity called Zianto Spanda, and then he admitted on the stand that the actual manufacturer of the mask was not Zianto Spanda. There's a portion in the brief where, as I think I'm reading it correctly, Bay Promo contends that the agreement didn't identify any specific manufacturer that had to be the one that provided it. Is that right? Well, there's multiple agreements we're talking about here. So we're talking about an agreement between Bay Promo and Ms. Mercado. That was just a brokerage agreement for 6% commission that wouldn't identify. Then there was the separate agreement that's made up of the various documents that flow between Bay Promo and Denim and Moore. And do those identify the specific manufacturer of the mask? Well, I think that taken as a whole, over several documents they do. So you started with a purchase order that required FDA certification of both masks. Without reference to the manufacturer. Without reference to the manufacturer. Then you move into the representation of these are our manufacturers. They're all FDA approved. Here's all their certification forms. And then the third document would be the guarantee. I guarantee that the masks being sent to New York are manufactured by Seattle Santa. So taking the three documents together to comprise the single agreement between New York So that third agreement was a guarantee as to the specific manufacturer that would provide it? Yes, it does. Now, in this particular case, and I'm sure New York would say, that manufacturer doesn't matter. It only mattered that he be FDA certified. The name is just the name. And the reason why New York rejected the order was actually threefold. It was not just the certifications. But just on the certification, just help me through that. FDA certifications were provided. Yes. But the FDA certifications were problematic because? Because none of them manufactured the masks. The masks were manufactured by some other entity that wasn't FDA certified. And just so I understand, the companies, the certifications related to the Chinese manufacturers or the certifications related to the manufacturer they said in the agreement was going to be the one who would provide the masks? Well, Ray Fomo testified that during the course of his operation, it goes to China and finds factories that manufacture masks, asks them for the FDA certifications, and they can all apply for and get FDA certifications. He collected all those documents and sent them to Ray Fomo. And so these were sort of an assurance to the buyers that your mask would be manufactured by an FDA certified person. So they did all that. But the masks that they ended up manufacturing were not from any of those companies. They were from another company that wasn't certified. Now, at trial, we didn't really say it in our brief, but at trial there was an attempt by the. . . So just if I understand before you get to this next point, if I'm tracking this, there's the name of a company that's not a Chinese company that there's a guarantee that's who's going to make the mask. That was a Chinese company. That was a Chinese company. Yes. And then that's different than the Chinese companies for which the certifications were attached to? No, that was one of the companies that. . . But then there were other companies also for which there were certifications. I think there were five companies. Yes. There were five certifications of five. . . Of which only one was the one that was the company that was guaranteed the mask would come from. Correct. One of them appeared on. . . And then as it happened, the mask came from other companies that are none of those companies. A single other company that was none of those other companies. And the evidence at trial shows that they were not. . . Counsel, that's what I read from the district court's findings, that it was more than that. The district court said that there was no credible evidence that the certifications were authentic. Yes. Or were ever provided to Denim and Moore. So there were additional reasons for the district court's finding. There are many reasons, yes. So one of those reasons was the fact that Mr. Umberto had a sort of a routine of submitting falsified evidence to the court. He submitted a falsified affidavit. He lost his ability to try his counterclaim because he forged a doctor's note. So you just take it close to your. . . the mic is. . . Oh, sorry. So the court was aware of that. And when this document appeared, it was represented by Mr. Umberto Aguero to be the certification that was in place during the time of manufacture. where a closer inspection of the document indicated that it was actually dated months or a year after the manufacturing process and was not relevant to the issue of whether that factory was certified at the time of this manufacture. Now, New York rejected the order because of the lack of proper certifications. Their investigation into the factory showed that the factory wasn't certified, that it wasn't timely, and that the quality of the masks was insufficient. They did their own examination and the masks were falling apart. They didn't meet up to its own standards. Mr. Aguero admitted that he was late, that he breached the temporal requirements of the contract. And so we have an admission on the stand by the defendant that they breached. They breached their agreement with New York, and that sort of is dispositive of the issue of who breached the contract. It formed the basis of the court's finding of fact that Bay Promo breached, and there was no evidence submitted. I'll make that representation. No evidence to that trial because I was there that anyone other than Bay Promo breached that contract. And apart from the issue of who breached, there's no other basis being asserted by Bay Promo for saying that Parrish was not a ready, willing, and able purchaser. It's an assertion that made no sense to me because in every one of these, there's 10 or 11 transactions, and in every one of them there was a purchase order sent by the buyer, there was a deposit paid by the buyer, there were delivery of goods, and then in every single order except the New York order, there was a full payment for the goods. So each one of those, they were ready, willing, and able, and they actually consummated. In New York, they were ready, willing, and able, but they didn't consummate because of the intervening breach at that period of time. So I think that the court properly interpreted the Knowles decision, and we'll stand by that. I don't know how much time I'll have. I think I only have four minutes left, so I'd like to get into the principal argument of the appellant, Ms. Moncada, and just move to really the end of my notes in which we talk about the error of law, I believe, that the court made in this case. So the court essentially ruled that because Mr. Parrish told Mr. Cravens about Bay Promo, that Ms. Moncada no longer becomes the effective cause of the relationship between Bay Promo and Mr. Cravens. So I'd like to divide that in half. The first half is to talk about the deals that were done by Mr. Parrish. So Mr. Parrish did three deals. The second deal was the deal in which Ms. – it was called the – I can't remember what it was. We used the shorthand beginning with a C at trial for that. Contour. Yes. Where it was the day after the commission agreement. So the commission agreement was signed on the 23rd. On the 24th, there was a new deal. It just came in from Mr. Parrish. Ms. Moncada sent that in to Bay Promo and said, here's the new deal. I'm going to do the purchase order, but I need your commitment that I'm going to get the 6%. The answer was a verbal yes. He was instructed to go to Mr. Thesau, Jarospora, Arguello's partner, verbal yes, and then she submitted all the documents. That was the evidence at trial. There was no evidence that Mr. Thesau didn't say yes. The only evidence was that he did say yes. But, counsel, I think here both of you are obviously arguing that the district court got some things exactly right and was clearly erroneous in some other findings. But I believe the district court said that it just didn't find your client's testimony credible on that point. And that's fair. And I do understand the standard judge, and I won't belabor that point. I won't then but go into the court's statement that there was, that Moncada, because of this relationship, Moncada didn't confer a benefit on Cravens. And I believe that that misstates the law in Florida. The facts are that Parrish and Cravens were a team. Mr. Cravens testified that we were a team and that we did the PPA jobs together. So they functioned as a team. Mr. Parrish started. Is Cravens from Kansas City? Who's the one from Kansas? One of them was from Texas. The other one, is there anyone from Kansas City? Yeah, maybe. I thought it was Florida. One of them was from, I think Parrish was from Texas. Parrish brought someone in, I thought, and brought it over to Bay Promo. So Parrish and his assistant, Alex, started the deal. He brought in Cravens. Cravens is the one he brings in. They did the PPA as a team, and Cravens then finished. What is your client's relationship to Cravens, given that Parrish is the one who reached out to Bay Promo, hey, someone call me, and I said, why don't you deal with Bay Promo? Parrish reached out to Moncada. Moncada brought Parrish in. Parrish said, I have this guy Cravens, I'm bringing him in. Cravens came in to work on Parrish's deal. Parrish had his assistant Alex continue to work with Cravens on these deals. They functioned as a team. That, to me, suggests that there was a partnership here. Moncada was dealing with the partnership. She was dealing with the enterprise of Cravens and Parrish purchasing PPE. This is all sort of a single series of transactions. Remember, all of these transactions, $11.5 million of sales, occurred in a six-week span of time. It just happened, bang, bang, bang, bang. Some of these conversations that appear maybe separated by days are only separated by hours, sometimes only minutes, in terms of the speed in which these transactions was going was just a breakneck. Before you sit down, can you just address the district court's finding that that yes to the WhatsApp message in the Delta transaction was ambiguous and therefore can't be the basis for an agreement? One thing that I always practice and I instruct people that report to me to practice is when you do a contract, when you do an agreement, the fewer words you use, the clearer you are. Maybe you should amend your advice. But the more words you use, the more ambiguity can be found in any contract. In this contract, the issue was do I get my 6%? And the answer was yes. I don't think that that's ambiguous. I don't think that there's anything vague about that. I think he used the word uncommittal. A word that can absolutely not be described as uncommittal is the word yes. There were no conditions attached to that word. Nothing else was said except the instruction, send the bid. So yes, you can have your 6%, send the bid. They're moving. What they're doing at this junction, this is the 20th. I think this is the 24th. Oh, no, maybe it was a week later. So it may have been like the 3rd of April. But still, the orders are coming in fast and furious. And the whole plan was just to get the sales going as fast as you can. And when you're working, moving a paper from right to left at breakneck speed, do I get my 6%? Yes. That's the way deals were run in this environment. And that's the way that they were run in this text. I think that the court miscategorized that yes. And I think that the evidence taken as a whole showed that that was an error in fact. Thank you. Okay. Thank you, Judge.